**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

October 16, 2024

**Via ECF and Email**
Honorable Jennifer H. Rearden
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re:  <u>United States v. Hassan Wright</u>
      24 Cr. 179 (JHR)

Dear Judge Rearden,

  Hassan Wright was born and raised under circumstances that no one would wish on any child: ███████████████████████████████████████████████████████ That formula – unfortunately common, but certainly tragic – led to exactly what one might expect: he found solace in negative peer influences, developed familiarity with guns, and landed in jail while still a teenager. When he got out of jail, without a GED, without real family support, and without any employment history, he had trouble finding a positive path. Still, he incurred no new arrests and successfully completed parole. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ He carried a gun for protection, including on November 15, 2023. That night, he streamed a video of himself on social media to a paltry number of viewers and flashed his weapon on screen briefly. The police were watching and arrested him. He accepted full responsibility for his unlawful possession of that weapon: he pled guilty to violating 18 U.S.C. § 922(g)(1).

  But there is hope. At 27 years old, Mr. Wright has the capacity to ensure that his future is different from his past. Our proposed sentence combines the need for substantial punishment and effective deterrence with a real path toward rehabilitation. The federal court system will offer Mr. Wright structure and support that he has never experienced: from the Probation Department, Federal Defenders, a halfway house, and multiple programs. <u>See</u> Exhibit B, Letter from Rachelle Williams, LCSW ("Re-entry Plan"). Each of these institutions will help directly address the underlying causes of Mr. Wright's offense conduct and make him – and his community – better in the future.

  For the reasons described below, we ask for a sentence of 12 months and 1 day of imprisonment, followed by 3 years of supervised release, to include 6 months in a halfway house, and alternative-to-incarceration programming.

Honorable Jennifer H. Rearden                                                                October 16, 2024
United States District Judge                                                                              Page 2

**Personal Background**

      From Hassan Wright's birth in 1996, through his instant arrest in 2024, he has been confronted with a series of terrible obstacles.  Mr. Wright's grandfather describes the circumstances of Mr. Wright's birth:

> [H]is mother is my daughter. She was 16 when she had him – she was just a baby herself. She was living with me at the time. ███████████████████████████████████
> ███████████████████████████████████
> ████████████████████  Exhibit E, Letter from Grandfather.



Hassan was "placed in a foster home in Brooklyn" and his great grandmother "frantically searched for him calling different agencies trying to find where he was."  Id.  Hassan's half-brother and half-sister already lived with their great grandmother; ACS ultimately placed Hassan with his great aunt when he was approximately 3 years old.  See id. ███████████████████████████████████████
███████████████████████████████████████

      Hassan did not only have to deal with his parents' physical absence – but their emotional absence as well: ████████████████████████████████████████  His grandfather writes: "[Hassan] lived with my sister because his parents could not take care of him. Even though the rest of us tried to step in, I think there was no real substitute and it messed with Hassan's head and heart badly."  Exhibit E, Letter from Grandfather.  His aunt echoes this sentiment: "I always felt that Hassan had deeply-rooted insecurity that stemmed from the lack of love he received from his parents."  Exhibit D, Letter from Aunt.  "I believe that their absence impacted Hassan a lot.  He felt unloved and abandoned by his parents, and that's not a hole that I could fill."  Id.

      Hassan barely knew his biological parents, but what he knew of them made them poor role models.  When Hassan was seven years old, his father went to prison for 10 years for a robbery.  When his father finished his sentence, he was deported to Guyana.  When Hassan was 10 years old, his mother went to federal prison for 10 years for drugs and firearms.  "Hassan has always had hurt and anger inside of him because of his mom being incarcerated for most of his life.  When you don't have that stable parent household, it impacts you."  Exhibit F, Letter from Friend Jessica.  His cousin writes: "There are subtle ways that you could tell [Hassan] was hurt. I think there's a lot of trauma and fear and misdirected anger that has affected him throughout his childhood. He never had the structure that he actually needed."  Exhibit G, Letter from Cousin.  In addition to his parents' absence from his life, crime – even violent crime – was normalized for Hassan during his early development.

Honorable Jennifer H. Rearden                                                                October 16, 2024
United States District Judge                                                                                    Page 3

Unfortunately, despite his aunt taking custody of him, Mr. Wright was never safe anywhere. His aunt's apartment was located between two housing projects, where turf wars and violence were rampant. He writes: "Growing up I was subject to seeing a lot of gun violence. Guns and violence were everywhere from the time I was a little kid." Exhibit A, Letter from Mr. Wright. His cousin – only 11 months older than him – explains the same: "Violence has been inescapable our whole lives. The neighborhood we grew up at was far from the best. I remember when we both saw our first shooting when we were 6 years old. We were looking out the window and we saw a guy get shot 6 times. That environment definitely impacted Hassan's choices." Exhibit G, Letter from Cousin.

Inside his aunt's apartment, Hassan fared no better. 

In 2010, while Hassan was 14, his sister – who was 16 years old at the time – was shot and killed by a stray bullet at a party. "This devastated Hassan." Exhibit D, Letter from Aunt. He writes: "Her death sits heavily in my heart." Exhibit A, Letter from Mr. Wright. His grandfather writes: "The death of his sister impacted him a lot. It hurt me a lot too because it was something that didn't have to happen. Nobody talked about it. I think it must have been hard for Hassan to hold in those feelings because he was so young." Exhibit E, Letter from Grandfather. "[H]e kept [the hurt] inside. I think that's because there was never a place where he was truly safe and comfortable…The way that he was able to control his emotions to that extent at such a young age is something that no child should have had to do. I feel terrible that he had to hold all of that pain inside." Exhibit G, Letter from Cousin. While Hassan suffered internally, he continued to act out externally. "Overcome with grief, he became withdrawn and angry. He acted out and I tried my best to enforce the rules but he was resistant." Exhibit D, Letter from Aunt.

Hassan ran away from his aunt's home to the home of his great grandmother, Gladys Wright. He wanted to escape his aunt and he also started having nightmares that his brother would die too, so he wanted to be closer with him. Upon learning that Hassan ran away, his aunt told him to stay there. This re-location was not a good one for the teenaged-Hassan. His great grandmother was too old to monitor his behavior and as an adolescent, he took more and more opportunities to duck her authority and spend time in the streets with his peers. His aunt writes: "I also think that he had too much freedom at my mom's house. She was too old to care for a teenager who was dealing with so much abandonment and loss." Id. Mr. Wright explains: "things started going downhill. I spent more and more time outside with no supervision. I spent more time with my friends, where I felt a sense of belonging. I had to act tough just to get through the day." Exhibit A, Letter from Mr. Wright. He skipped more and more school; when he was there, he was always getting into fights and getting picked on and he struggled to pay attention. "Hassan wanted to learn in school, but he had difficulty concentrating in class. He

needed more help than he got." Exhibit D, Letter from Aunt. He ultimately stopped attending high school before graduating.

When Hassan was 17, his mother was finally released from federal prison. Hassan and his brother went to live with her briefly, but it was a resounding failure. The hurt and feelings of abandonment that Hassan had carried since he was a young boy overwhelmed him: "Hassan had so much pent up pain: he kept asking her why she let him linger in foster care. Hassan was always affectionate and caring, but he felt that his mother did not love him, which hurt him deeply." Id. And, he found a mother who was still not very interested in him, was self-centered, and had moved on to parenting her youngest son (who was born after her release). "She never acts like a mom or like she cares about me, and I don't need that in my life." Exhibit A, Letter from Mr. Wright.

Mr. Wright has a single prior criminal conviction for possessing a gun (and firing it) when he was 18 years old. He and his family had already suffered so much via gun violence; his sister's grisly death and his parents' convictions should have sent Hassan strong messages that guns are dangerous and that their possession will have significant consequences. But, it also demonstrates how prevalent and normalized guns and violence were in his community. And for a young man who never felt safe anywhere – and had been victimized by strangers – carrying a gun was a normal safety precaution. For this crime (which also covered another indictment), he served 5 years in prison (he was released in 2019) and post-release supervision (which he completed in 2022). He did not incur any further convictions until the instant case.

After he was released from prison in 2019, Mr. Wright tried to get his life back on track. He made some positive strides, but also suffered some serious setbacks. He took his GED test, but he was shot (as discussed below) and was not able to obtain the results. He is eager to secure his GED once and for all while on federal supervision. He worked intermittently, cleaning a barbershop, and working for a friend's cleaning company. Mr. Wright believes that same friend would be willing to re-hire him in the future. He formed some positive relationships, including with his current girlfriend. He has other close friends and family who continue to support him too. His cousin writes: "He's a great person, and he's one of the smartest and most thoughtful people I know. He's hilarious, he can light up any room that he walks in to. That's a side of him that a lot of people don't see often." Exhibit G, Letter from Cousin. His friend writes: "He's such a sweetheart even though he tries to act like he isn't. He is smart and likes to talk about interesting things, which is different than most of the boys I grew up around." Exhibit F, Letter from Friend Jessica. "Even with a rough childhood, he's always been a soft, genuine family man. He's always trying to take care of the people around him…He is a good person who cares about the people in his life." Id.

But the five years following his imprisonment also included additional trauma. [redacted]."

Exhibit G, Letter from Cousin. "He tried his hardest to smile, tell jokes, laugh, and not try to show the pain." Id. ███████████████████████████████████ ███████████████████ He requires follow up care with his doctors at Jacobi Hospital once he is released.



Mr. Wright also experienced housing instability: "unstable housing…caused him to be vulnerable and in unsafe conditions." See Exhibit C, CASES letter. Unfortunately, his family was an unreliable and under-performing source of support. But, living with peers, in an unstructured environment did not promote good decision-making; indeed, Mr. Wright was out with his peers on the night of his arrest, when he engaged in the instant offense conduct.

**Offense Conduct**

On November 15, 2023, Mr. Wright was riding in the passenger seat of a friend's vehicle and then standing next to it after it parked. He and his friends were listening to music and smoking marijuana and Mr. Wright began recording himself on Instagram live – a social media platform where you can stream live videos to your friends. He broadcast two videos, which were less than 5 minutes in length. During the videos, Mr. Wright sang, talked, and smoked, and he briefly flashed a firearm into the screen's frame on a few occasions. The videos were viewed by barely anyone (the app has a counter on the screen). The number of viewer accounts vacillated between one and six during the videos – at least one of which belonged to the NYPD. Upon viewing the videos and determining Mr. Wright's location, NYPD officers went and arrested him. He was charged with possession of the firearm he had displayed.

At no point did Mr. Wright use the firearm other than as a fleeting prop in his video. He engaged in no violence, made no threats of violence, and did not use the weapon against anyone in any way. Still, it was a bad choice to possess the gun at all (and it was even more misguided

to display it for such nominal entertainment value).  Mr. Wright knows that it was (and is) illegal for him to possess a firearm and he knows that they are inherently dangerous.  Indeed, as described above, he has been a serious victim of gun violence – losing his sister to gun violence, and sustaining life-threatening injuries from a shooting himself.  But while those events had some deterrent effect, they also perversely led to his offense conduct: Mr. Wright possessed the gun in the instant case for his safety from the violence of others: "When I decided to possess the gun I got arrested with, I didn't have any intention on hurting anybody and just wanted to protect myself." Exhibit A, Letter from Mr. Wright.  His cousin writes: "I think Hassan had a gun because of all the violence he's seen and been through.  Seeing so many people fall victim and to be victimized yourself made him feel like he had to protect himself."  Exhibit G, Letter from Cousin.  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ xhibit F, Letter from Friend Jessica.  Mr. Wright told the officers the same immediately upon his apprehension: "It's my gun.  I carry it because I was shot two years ago and I'm afraid for my life."  This sad reality is not an excuse for his choices, but it does help explain them.

Mr. Wright writes: "[I] accept all responsibility for my actions.  I know it was illegal and irresponsible for me to have a gun.  I was showing off online, trying to look tough.  But I know better than anyone that guns are dangerous."  Exhibit A, Letter from Mr. Wright.  "I also understand that I cannot and will not possess a gun in the future.  I know it is illegal and dangerous.  It will just land me back in jail and that is no good for the person I want to be in the future." Id.

He knows that if he wants to have a positive life trajectory, he will have to make positive choices: "I want to be someone who contributes positively to my community and my family… I will have to make changes if I want to be a changed person." Id.  "I look at some of the older guys in here and I can't believe they have not yet learned their lesson.  I am determined not to be like them.  I will not put myself in another predicament again that would put me back here." Id. He has discussed the same with his cousin, who writes: "I…don't want him to break the law and go back to jail.  I know he feels the same way.  He is going to have to break out of the negative cycle that, frankly, he was born into."  Exhibit G, Letter from Cousin.  "He has told me that he does not want to end up back in jail and that he has to do things differently when he comes home."  Exhibit D, Letter from Aunt.

Procedural History

Upon his arrest by NYPD on November 15, 2023, Mr. Wright was brought to Bronx Criminal Court, where he was initially prosecuted for the instant offense conduct.  He was released on his own recognizance the next day and ordered to participate in programming at the Center for Alternative Sentencing and Employment Services (CASES), an alternative to

incarceration program,[1] in an effort "to earn a non-incarceratory disposition." See Exhibit C, CASES Letter.

CASES uses a multi-faceted model, to help its participants tackle their multi-faceted struggles. For example, they offered Mr. Wright counseling services for the first time in his life. His therapist reported: "Mr. Wright remains engaged[,] provides thoughtful feedback during sessions and demonstrates a willingness to participate in any activities that will benefit him in fulfilling his personal and program goals." Id. CASES also enrolled him in their pilot gun diversion and violence prevention program, and they offered resources for housing and employment readiness. At all times during his participation, "he maintained great communication with [CASES] staff." See id.

On February 27, 2024, the federal authorities decided to prosecute Mr. Wright for the same gun charges he had been facing for more than three months in the Bronx. He was detained in SDNY and as such, his participation in CASES was interrupted.[2] Because of the instant federal prosecution, the state case was dismissed.

Guidelines Calculation

The parties and Probation agree on the applicable Guidelines calculation. The base offense level is 14 because Mr. Wright was a prohibited person when he possessed the firearm. See U.S.S.G. § 2K2.1(a)(6)(A). Two points are subtracted for Mr. Wright's timely acceptance of responsibility. See U.S.S.G. § 3E1.1(a). The adjusted offense level is 12.

Mr. Wright has a single prior criminal conviction, which gives him 3 criminal history points. See PSR ¶¶ 30-32. In turn, he is in criminal history category II. See id.

The resulting guidelines range is 12 to 18 months' imprisonment. This range is in Zone C of the sentencing table. This means that the guidelines can be satisfied by 6 months of imprisonment and 6 months of community confinement (i.e. halfway house placement) or home detention. See U.S.S.G. § 5C1.1.

---

[1] See CASES website, available at https://www.cases.org/about/mission/ (describing its mission as "committed to helping people—regardless of their past choices, present struggles, or future obstacles—to build the capacity and courage to change their lives" by "tailor[ing] our services to each individual's unique needs, risks, and strengths and believe the most effective programs are evidence-based, family-focused, and trauma-informed" and "engaging the community by leveraging partnerships and resources to maximize our clients' opportunities for success."

[2] Mr. Wright was granted a bail package by the Magistrate Judge at his presentment. We did not meet the conditions and Mr. Wright has been in continuous custody since his federal arrest.

Honorable Jennifer H. Rearden  October 16, 2024
United States District Judge  Page 8

**Appropriate Sentence**

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013). That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)." Id. (quoting United States v. Dorvee, 616 F.3d 174, 183 (2d Cir. 2010)). "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation." Id. The Court "must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007). In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487-88 (2011) (citations omitted).

A sentence of 12 months and 1 day of imprisonment and supervised release that includes 6 months in a halfway house and programming, is sufficient to accomplish the goals of sentencing in this case.

Re-entry Planning

Mr. Wright explains: "I'm still young and my mind is still growing…I have time to make a U-Turn." Exhibit A, Letter from Mr. Wright. To make that change in his trajectory, Mr. Wright needs structure and support. His cousin writes: "He has a lot of potential, if he just had something to put his energy towards…If he has the right support system behind him, I believe he can do it…[he] could be a positive force if he is given the chance and the resources." Exhibit G, Letter from Cousin.

This federal sentence can give him the support and resources that he needs. A combination of imprisonment and a robust, strict set of supervised release conditions will, together, form a sentence that achieves the statutory goals of sentencing. In addition to the support of his Probation Officer, the Federal Defenders' Social Work Department stands ready to assist Mr. Wright with his short and long-term goals. See Exhibit B, Re-Entry Plan.

As part of his supervised release, we request that the Court mandate that Mr. Wright spend the first 6 months in a halfway house (or RRC, Residential Re-entry Center). Such a placement would provide Mr. Wright with two of the things he desperately needs when he is back in the community: housing ("Mr. Wright acknowledged housing instability as a significant stressor leading up to his instant incarceration") and structure ("[t]he RRC provides 'a safe, structured, supervised environment'"). See id. In addition, the RRC staff will closely monitor Mr. Wright's behavior as he transitions onto supervision, providing another layer of support and accountability.

We also request that Mr. Wright be required to participate in an alternative-to-incarceration program. Specifically, we have spoken with CASES and understand he can return to their program. See id. "Mr. Wright can re-engage with CASES in their alumni track for continued support. Ms. Tineo [his former case manager] confirmed that he will have access to

coaching sessions, job readiness training, and treatment referrals. The ROAR team will assess Mr. Wright's current needs and re-connect him with community behavioral health services." Id. Given Mr. Wright's prior relationship and positive experience with CASES, we believe this will be a good fit for his future programming.

> Mr. Wright needs assistance in the following areas:
> - Housing
> - Education
> - Vocational training
> - Medical
> - Mental health
> - Drug treatment
> - Public assistance

As detailed in Ms. Williams' letter, see id., Probation, CASES, and Federal Defenders will ensure that Mr. Wright is connected with the myriad of services that he needs in the community. The federal court system is uniquely able to punish and deter Mr. Wright – but also provide him with a tangible path towards rehabilitation that he has never had access to before. Each of these services offers Mr. Wright something of value and they also demand that he put in serious work, effort, and commitment. If he rises to these challenges and takes advantages of the opportunities presented to him through this sentence, then he will be better for it, and so will the community.

In addition to the support offered through the federal court system, Mr. Wright also has his aunt as a resource. During his instant incarceration, they have worked hard to repair their relationship. Mr. Wright writes: "When I first got locked up, I called her and told her I blame myself for not listening to her and I appreciate her for everything." Exhibit A, Letter from Mr. Wright. He explains that he has grown to appreciate the discipline she tried to impose on him as an adolescent: "I realized when I got older that she was pushing and punishing me hard because she was trying to keep me away from the streets. She wanted me to be a good kid and have good life." Id. His aunt confirms their current connection: "Since he has been in jail, I have been talking to Hassan regularly. I am glad to be there for him and I think he is grateful to have my support. We recognize the importance of each other." Exhibit D, Letter from Aunt. She has also offered her home to Hassan if he is not able to secure his own housing after 6 months at the RRC. See id. ("I am willing to do whatever it takes to help him. In the future, I am willing to provide living space for him in my home, and to help him straighten out his life, so that he becomes the productive citizen that I know he can be.") Despite their troubled history, Hassan knows that he has family and loved ones in his corner: "I have adult relationships now with my aunt who raised me and my cousins and they are the family that I care about and rely on." Exhibit A, Letter from Mr. Wright.

Finally, Mr. Wright is determined to ensure that his future is different from his past: "I want to be an adult that is fully transformed from the person I was before. I want to be able to tell my kids that I used to be in the streets and not have them believe me because I'm so different." Id.

Honorable Jennifer H. Rearden  
United States District Judge

October 16, 2024  
Page 10

<u>12 Months and 1 Day of Imprisonment Would Prevent Unwarranted Disparities</u>

The statistics offered by the Judiciary Sentencing Information (JSIN) support the requested sentence. For the 580 defendants who had Mr. Wright's offense level and criminal history category, and were sentenced using U.S.S.G. § 2K2.1 in the last five fiscal years, the average sentence imposed was 11 months and the median sentence was 12 months. <u>See</u> PSR.

In this case, the appropriate sentence should be similar to other defendants who possessed a weapon in public, but did not harm anyone with the weapon in any way:

- <u>United States v. Figueroa</u>, 18 Cr. 293 (ER), Dkt. Nos. 41, 44 (sentencing defendant to **no jail time**, with one year of home detention, when his guidelines were 24 to 30 months and he was standing on a public street corner)
- <u>United States v. Minaya</u>, 19 Cr. 487 (CM), Dkt. Nos. 30, 31 (Oct. 14, 2021) (sentencing defendant to **no jail time** when the guidelines were 36 to 47 months and he had a gun while walking down the street)
- <u>United States v. Lawrence</u>, 21 Cr. 127 (PGG), Dkt. Nos. 51, 52 56 (sentencing defendant to **no jail time**, with 250 hours of community service, when the guidelines were 12 to 18 months and he had a gun in the back seat of a car)
- <u>United States v. McConico</u>, 16 Cr. 690 (KMW), Dkt. Nos. 39, 40 (sentencing defendant to **5 months'** time served and 5 months strict supervised release when the guidelines were 12 to 18 months and he possessed a gun on the street)
- <u>United States v. Jackson</u>, 19 Cr. 492 (RA), Dkt. Nos. 50, 51, 64 (sentencing defendant to time served after **8 months** in jail when the guidelines were 37 to 46 months and he possessed the gun on the street while drinking alcohol)
- <u>United States v. George</u>, 17 Cr. 427 (JPO), Dkt. Nos. 27, 28 (sentencing defendant to **12 months and 1 day** imprisonment when the guidelines were 27 to 33 months and he possessed a gun as a passenger in a car)
- <u>United States v. Bryant</u>, 17 Cr. 78 (VSB), Dkt. Nos. 23, 24 (sentencing defendant to **12 months and 1 day** imprisonment when the guidelines were 30 to 37 months and he possessed a gun on the street)
- <u>United States v. Caraballo Crespo</u>, 16 Cr. 536 (PKC), Dkt. Nos. 48, 49 (sentencing defendant to **13 months'** imprisonment when the guidelines were 10 to 16 months and he possessed a gun in a car)
- <u>United States v. Carter</u>, 22 Cr. 271 (LTS), Dkt. No. 29, 32 (sentencing defendant to **15 months'** imprisonment when the guidelines were 27 to 33 months and he possessed a gun when getting out of a cab)
- <u>United States v. Diaz</u>, 23 Cr. 630 (JPO), Dkt. Nos. 25, 27 (sentencing defendant to **18 months'** imprisonment when his stipulated guidelines were 30 to 37 months and he possessed a gun on a scooter and possessed with intent to distribute fentanyl)
- <u>United States v. Slaughter</u>, 21 Cr. 230 (KPF), Dkt. Nos. 62, 63, 65 (sentencing defendant to **21 months'** imprisonment when his guidelines were 24 to 30 months and he possessed a gun in a car and it was his "<u>third</u> conviction for violating 18 U.S.C. § 922(g)(1), 2 and his <u>fourth</u>…conviction for illegally possessing a firearm.").

Mr. Wright has Endured Extremely Harsh Conditions at the MDC

Mr. Wright has been incarcerated at the MDC since February 27, 2024. The conditions at MDC have been criticized by judges throughout the Southern and Eastern Districts of New York. For example, Judge Irizarry in the Eastern District has pointed to "the abominable conditions at the MDC." United States v. Young, 23 Cr. 475 (DLI) (Dec. 13, 2023). Judge Berman has said that the MDC is "dirty," "infested with drugs," and pervaded by "violence." United States v. Moran, 19 Cr. 209 (RMB) (May 5, 2020), Dkt. No. 90, Tr. 12-15, 37. Judge McMahon has described the conditions at the MDC as "disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." United States v. Days, 19 Cr. 619 (CM) (Apr. 29, 2021), Dkt. No. 35, Tr. 19.

The conditions there have only worsened over time. The current, acute staffing shortages have created a crisis at MDC. Judge Furman found that "[d]ata provided by the Government (at the Court's direction) confirms that there have been severe staffing shortages at the MDC for years." United States v. Chavez, 22 Cr. 303 (JMF), 2024 WL 50233 (Jan. 4, 2024), at *1 (noting that, "as of November 2023, the MDC was operating at only about 55% of its full correctional officer staffing level"). MDC corrections staff explained the practical consequences of such shortages to BOP leadership in a letter dated June 23, 2023:

> The [BOP]'s actions are inhumane to both staff and inmates, as the institution remains locked down on several occasions, which angers the inmates and heightens the inherent danger for staff. Coverage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and or inmate medical emergencies.

Judge Kaplan has spoken of the same:

> Serving time over the past few years in [Essex and MDC] has been horrible. It is, in significant measure, the fault of a government which does not provide the facilities or the money to hire competent staff in sufficient numbers to run those facilities in a humane and effective manner. It's a problem we've been dealing with every day for a long time. A sentence of a year in those prisons today, although it's very hard to quantify, is ever so much worse than it would have been five years ago. It's just dreadful.

United States v. Tontisabo, 21 Cr. 701 (LAK) (Jan. 3, 2024), Dkt No. 77. The MDC puts undue stress on its residents and their families; Mr. Wright's friend writes: "I just have to wait to hear from him, which is so hard, because I don't know what's going on in there. I'm scared and worried for him." Exhibit F, Letter from Friend Jessica.

The staffing shortages and lockdowns only exacerbate the abysmal "physical conditions" at MDC, which, Judge Furman held, "have long been problematic." Chavez, supra (citing reports of mold, vermin, denial of light and heat, overflowing toilets, etc.).

The staffing shortages continue to endanger the lives of Mr. Wright and his fellow inmates. In April, an inmate was stabbed 40 times before the single corrections officer on the

unit was able to intervene.[3] Just this summer, two MDC residents were killed.[4] These losses have had a profound effect on the other inmates: they know they are not safe.

The medical care is just as bad. As Chief Judge Swain said: "we in this Court all know from personal experience that medical care at MDC… is appalling." United States v. Diaz, 23 Cr. 260 (LTS) (January 16, 2024), Dkt No. 43. The medical staff at MDC is suffering from the same institution-wide shortages that plague the entire facility. The medical staff rate – at only 69%, with 20 of 29 positions filled – is the lowest it has been in more than two years. See Gov't Ltr., United State v. Chavez, 22 Cr. 303 (JMF), Dkt. No. 28 (Dec. 6, 2023). The medical staff has repeatedly failed to provide the most basic level of care. See, e.g., United States v. Goulbourne, 22 Cr. 106 (LDH) (E.D.N.Y. May 1, 2024), Dkt. Nos. 330-50 (holding an emergency hearing regarding the MDC's failure to provide a full course of antibiotics and prescribed pain medication for an inmate following emergency surgery).

Mr. Wright has experienced this sub-par care first-hand: At MDC, he continues to experience numbness and nerve pain in his lower extremities, but he has received no substantive medical care. He also reported repeated instances of discovering blood in his urine, for which he has also received no medical attention. There is simply no question that Mr. Wright has been punished severely for his crime.

Numerous courts in this District have recognized that excessively punitive conditions in pre-sentence detention warrant consideration: "It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." Chavez, 2024 WL 50233, at *1; see also, United States v. Phillibert, 15 Cr. 647 (PAE), 2021 WL 3855894, at *4 (Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring a just sentence.") (internal citations omitted); United States v. Barreto, 19 Cr. 909 (KPF), Dkt. No. 72 (June 27, 2023) at 57 (stating that challenging pretrial confinement conditions have been and will continue to be a basis for a downward variance); United States v. Carter, 22 Cr. 271 (LTS), Dkt. No. 33

---

[3] See John Annese, "Video from inside troubled Brooklyn federal jail shows brutal gang stabbing," N.Y. Daily News (July 27, 2024), available at https://www.nydailynews.com/2024/07/27/see-it-video-from-inside-troubled-brooklyn-federal-jail-mdc-shows-brutal-gang-stabbing/.

[4] See John Annese, "Inmate at Brooklyn's troubled Metropolitan Detention Center is stabbed to death: sources," N.Y. Daily News (June 20, 2024), available at https://www.nydailynews.com/2024/06/20/inmate-at-brooklyns-troubled-metropolitan-detention-center-is-stabbed-to-death-sources/; John Annese, "Inmate dies in violent brawl at Brooklyn's Metropolitan Detention Center," N.Y. Daily News (July 17, 2024), available at https://www.nydailynews.com/2024/07/17/inmate-dies-in-violent-brawl-at-brooklyns-metropolitan-detention-center/.

| | |
|---|---|
| Honorable Jennifer H. Rearden | October 16, 2024 |
| United States District Judge | Page 13 |

(Mar. 22, 2023) at 29-30 (imposing a downward variance, in part, because of the "harsh conditions of confinement"). The Court should follow suit here.

## Conclusion

For all of these reasons, a sentence of 12 months and 1 day of imprisonment, followed by 3 years of supervised release, to include 6 months in a halfway house, and alternative-to-incarceration programming, is sufficient to achieve the statutory goals of sentencing and is consistent with the interests of justice.

Respectfully submitted,

/s/
Sylvie Levine
Counsel for Hassan Wright